[No. 42427.    En Banc.    May 10, 1973.]

LOIS ASHLEY, *Appellant*, v. THE SUPERIOR COURT FOR PIERCE COUNTY, *Respondent*.

VICKY LYNN MARX, *Appellant*, v. THE SUPERIOR COURT FOR PIERCE COUNTY, *Respondent*.

*Robert M. Reynolds*, for appellant.

*Ronald L. Hendry, Prosecuting Attorney*, and *Arthur W. Verharen, Chief Civil Deputy*, for respondent.

*Slade Gorton, Attorney General,* and *William C. Collins, Assistant, Anthony J. Karrat,* and *Lar Halpern,* amici curiae.

HALE, C.J. — Appellants, claiming indigency, each brought an action for divorce in the Superior Court for Pierce County. They moved for waiver of the filing fee and requested an order that the costs of service of summons and complaint be advanced from the public treasury. From a denial of their respective motions, they applied to the Court of Appeals for a writ of mandamus and, from a partial relief allowed by that court, have filed here what is denominated as an application for a writ of certiorari, but which we will treat as a consolidated appeal on an agreed record from the Court of Appeals.

The parties are in substantial agreement concerning the operative facts in each of these cases. Lois Ashley, in her action for divorce in the superior court in Pierce County, sought an order both waiving the filing fee and directing that process be served upon her husband at public expense, that is, charged upon the public treasury on the court's budget. When the court declined to grant this relief, appellant applied to the Court of Appeals for a writ of mandamus allowing her to proceed in forma pauperis with a judicial waiver of the appearance or filing fee and for an affirmative order that the Superior Court or other appropriate agency of the county assume the costs of service of process. In support of that application, plaintiff showed that court, as she represents here, that she is dependent upon public assistance for the support of her family.

Mrs. Ashley's affidavit says that she has minimal household goods and furniture and receives $291 per month from the state's Department of Social and Health Services under its program of aid to families with dependent children. Her husband, she says, abandoned the family 3 years earlier, and refuses to support it. During his absence he has sent to her only $200. He is a musician in a rock-and-roll band, she says, and is usually traveling but occasionally stays with his parents in Scappoose, Oregon. She has two children by

a prior marriage, ages 14 and 15, and two by the present marriage to Mr. Ashley, ages 9 and 12, all of whom are dependent upon her for support. She asks this court not only to direct the superior court to waive plaintiff's appearance or filing fee but additionally to pay from the county treasury the taxable costs of finding the defendant husband and completing service of process, whether by publication or personally, upon him. She asks the court to require her husband, Travis J. Ashley, to pay $75 per month each for the support of his two children until they attain 21 years of age or become self-supporting, and she would grant him reasonable visitation rights.

In the other action, Vicky Lynn Marx seeks a divorce from Glennis D. Marx. She alleges that they married in 1970 and have one child, and that her husband is unemployed but should be required to pay $75 per month for the support of his child. Plaintiff, too, is unemployed and receives from the Washington State Department of Social and Health Services $199.65 per month for herself and child. She alleges cruelty and personal indignities rendering life burdensome as grounds for divorce and seeks custody of the minor child, but she would grant her husband reasonable visitation rights.

The parties plaintiff here also assert, as grounds for their divorce, separation from their respective husbands for more than 2 years. Neither plaintiff nor any state agency has made any effort evident in this record to require the absent husbands to advance suit money or costs. Both plaintiffs, Lois Ashley and Vicky Lynn Marx, were represented in the superior court, in the Court of Appeals, and in this court without charge by counsel provided by the Pierce County Legal Assistance Foundation, a federally financed agency. That agency, however, has made it clear that, although it has public funds available for supplying legal counsel and other assistance to indigents in civil cases, it finds it inadvisable to expend federal funds for court costs such as appearance fees, official publication, and costs and fees for

service of process on behalf of indigent litigants in such civil cases.

Divorce, like marriage, is largely a private matter to be resolved between husband and wife, and the constitution places no affirmative duty on the state to foster, encourage or finance either marriage or divorce. The state's policies against outside pressures for divorce are partly declared in a statute prohibiting any advertising "offering to procure or obtain, or to directly or indirectly aid in procuring or obtaining any divorce." RCW 9.04.020. But, the state does retain an exclusive power over the dissolution of marriage which it does not exert in most other contractual relationships. It allows dissolution of marriage only in the courts and for reasons explicitly prescribed in law. Accordingly, it is recognized that, although a divorce action is a private matter, the state has an interest in it far beyond the concern it takes in most private litigation.

On the question of whether principles of due process require a waiver of appearance or filing fees in divorce cases for reasons of indigency, plaintiffs here rely principally on the rule in *Boddie v. Connecticut,* 401 U.S. 371, 28 L. Ed. 2d 113, 91 S. Ct. 780 (1971). The ratio decidendi of *Boddie,* as set forth by Mr. Justice Harlan in the majority opinion, was based upon the premise that, because the state controls the legal ramifications of marriage and divorce and provides the exclusive mechanism for dissolving a marriage, indigent persons cannot constitutionally be denied access to the divorce courts for want of an appearance or filing fee. The state, it is reasoned, having exclusive dominion over the legal institution of marriage and its dissolution, cannot bar the use of the state's exclusive mechanism established for dissolution of marriage solely for reasons of poverty. The opinion on this point says:

> Thus we hold *only* that a State may not, consistent with the obligations imposed on it by the Due Process Clause of the Fourteenth Amendment, pre-empt the right to dissolve this legal relationship without affording all citizens access to the means it has prescribed for doing so.

(Italics ours.) *Boddie v. Connecticut, supra* at 383.

It should be recognized that among civil actions a divorce is unique for it affords a remedy available only in a court of competent jurisdiction. If one cannot go to court he cannot lawfully terminate the marriage contract.

■ Courts have been created and are maintained by the people for the public benefit and under our constitution perform an indispensable service to a democratic society. Thus, it is sound public policy that they are maintained largely at public expense through funds derived from general taxation. But their existence allows peculiar benefits to those who actually use the courts in particular cases. For this reason, the state has a legitimate interest in requiring payment of filing or appearance fees generally from those who utilize the courts.

■ In order for the court to waive the filing or appearance fee in a divorce action, however, the showing of poverty must be actual and not theoretical. To support the waiver of fees in forma pauperis, the applicant must make a clear showing to the court that, but for such waiver, the plaintiff would be unable to maintain the action for divorce, and that there are no alternative means available for procuring the fee. The plaintiff must show to the court's satisfaction that the indigency is genuine, the need for the divorce is real, the grounds are meritorious and neither frivolous nor transient, and the divorce action is brought without the connivance, concurrence or collusion of the defendant. Finally, it should be made to appear that the filing fees cannot be obtained from other sources nor taxed in advance upon the defendant spouse.

We therefore remand to the superior court. If the court in the exercise of its discretion determines that plaintiffs are genuinely indigent; that their needs for divorce are real —i.e., founded in actual circumstances—and not theoretical; that the filing fees and costs cannot with reasonable diligency be obtained from the defendant spouses; and that these actions and the petitions of indigency are not collusively brought nor frivolously maintained, and are without

the connivance of the defendant spouses, the court shall direct that payment of filing or appearance fees, as a condition to proceeding with the actions, shall be waived.

■ As to the application for payment out of the public treasury of the costs of service of the summons and complaint, either personally or by publication, we think the situation is markedly different. It is one thing to waive the filing or appearance fees required by the courts already in existence and functioning largely at the expense of the general public and quite another to affirmatively order the expenditure of public money out of the public treasury for private purposes without any appropriation whatever from the legislative branch of government. We need not decide definitively here whether the budget for the operation of the superior court is a state fund or a county fund, or an admixture of both, to conclude that no money may be paid out of it to the order of private persons except in pursuance of an appropriation by law. The state constitution is explicit on this point:

> No moneys shall ever be paid out of the treasury of this state, or any of its funds, or any of the funds under its management, except in pursuance of an appropriation by law . . .

Const. art. 8, § 4 (amendment 11). And the use of the money of any county, city, town or other political subdivision for any purpose not authorized by law is not only prohibited but is declared to be a felony. Const. art. 11, § 14.

It is thus clear that the state constitution forbids the employment of public funds except upon appropriation by the legislative authority. No such appropriation has been made by the legislature or its subordinate legislative bodies in this state for fees of the sort asked here. The only appropriation shown in this record made for the purpose of providing court costs and expenses for indigent persons in private litigation is the one provided by Congress to fund the Economic Opportunity Act of 1964 (42 U.S.C. § 2809(a)(3)), which provided counsel for plaintiffs here without costs or charge.

The constitutional limitation declared in Const. art. 8, § 4 we think, applies to the county treasury as well, and no moneys may be expended therefrom except upon appropriation by the county legislative authority. No appropriation has been made either by the state or the county for the payment of costs of travel for the service of process in private civil litigation at the behest of private parties, nor for the payment of printing and circulation costs where, in private litigation, service is to be by publication. Accordingly, we conclude that the plaintiffs' application for the payment of costs of service from the county or state treasury, as the case may be, should be denied even though the action be one for divorce.

Plaintiffs are not, however, without alternative means of serving process. Plaintiffs may have any person over the age of 18 years, competent to be a witness, and not a party to the action, make personal service either within or without the state. In many cases this can and will be done without any costs or charge whatever. And if plaintiffs are qualified for public assistance, including aid to dependent children, and the needs for divorce are genuine and based on meritorious grounds, we see no reason why the fees essential to docketing and serving the necessary papers in a divorce action, if properly budgeted, could not be paid by the state's Department of Social and Health Services or other appropriate department of state government in the same manner and upon the same bases that the state provides these plaintiffs and their children with food, clothing, shelter, medical care and other true necessaries of life. The state, in funding the necessary court costs out of the public assistance appropriation, would be doing no more in particular cases than discharging a responsibility which it has assumed in the care of indigent persons generally. But in doing so, it would afford reasonable screening of divorces in forma pauperis so as to curtail the very abuses quite likely to arise in widespread free litigation in private civil actions.

Plaintiffs' counsel have furnished this court with an explanation of why the federal government, in providing counsel without cost to these plaintiffs and thus assuming by far the greater costs of these actions, has declined to provide the additional but comparatively minor costs of service of process or the filing fees for that matter. A memorandum issued in December, 1970, by Erwin N. Griswold, Solicitor General of the United States, stated that the legal services rendered these plaintiffs come within the Economic Opportunity Act of 1964, as amended, 42 U.S.C. § 2701, *et seq.*; that the office of legal services has been established and financed by the Congress to provide legal counseling, representation and other lawyer services to people of this country living in poverty. For fiscal 1970, the Congress appropriated some $58 million for the operation of 267 neighborhood legal services programs, and of the thousands of matters considered by these offices and brought to litigation more than 60,000, or over 50 percent, involved domestic relations problems. The solicitor general's memorandum, however, implies that there is no legal bar to use of these federal funds for filing fees in state courts on behalf of indigent clients, but rather that the practice is merely discouraged because of administrative policies against it. "Local programs do have some leeway in deciding how to spend the federal funds they receive," says the memorandum, and adds:

> Thus, it is entirely possible that a particular program would use a portion of its funds to pay some filing fees, for example in cases where the substantive question sought to be raised by the lawsuit was deemed of particular importance to the program. Local programs would not, however, be funded to pay such fees as a matter of course, because the Office of Economic Opportunity does not consider such uses of its limited funds to be sufficiently productive.

And the solicitor general says, too, that "A typical program grant will usually have a small budget allocation for 'Court Costs,' " but any allocation over 1 percent would be

excessive "unless justified by experience and by a need supported by evidence."

Appellants' counsel estimate that if indigent persons may file and have their process served without cost, in addition to the 2,300 divorce actions brought in Pierce County alone in 1971, another 800 would have been filed in forma pauperis. These figures present the curious anomaly of a federally financed agency deriving its funds from the comparatively vast sources of the federal treasury, operating on a budget of nearly $60 million but declining to assume the modest additional costs of filing and service of process in these actions and thus placing an enormous increase in the costs of maintaining a state judicial system, without assuming that small part of such added expense as is represented by filing fees and fees for service of process. Of the two treasuries best able to afford the costs of filing fees and services of process in divorce actions, that of the federal government with its virtually unlimited power of taxation would seem most appropriate and equitable. It would appear if an agency of the United States Government has $58 million with which to supply legal counsel in civil matters to indigent persons, and that its activities will add some 800 civil cases each year to the docket load of Pierce County alone, the federal government should as a matter of policy assume the rather modest costs of filing these additional cases. The payment of filing fees and service of process fees should, we think, come within that leeway which the solicitor general mentioned "in deciding how to spend the federal funds they receive."

In summary, then, we think that due to the state's supervening interest in divorce matters with ultimate control over dissolution of marriage lodged in the courts of this state, the capabilities to pursue this remedy ought not, under the constitutions, be denied on account of poverty. And, since a divorce may not be obtained except by the decree of a superior court, the appellant's application for waiver of filing fees in a divorce action where the plaintiff by reason of poverty cannot obtain the funds with which to

file the divorce action and is without means otherwise to bring the action should be granted. But with respect to the costs of service of process, whether by publication or personal service by delivery of the summons and complaint, in the absence of statute affording equal protection, the rule ought to be and is different.

■ Finally, we note a ready alternative to service by publication in divorce cases brought in forma pauperis which we think lies within the trial court's discretion to allow—*i.e.*, service by mail. Service of process generally is covered by statute. RCW 4.28.080-.185. The courts are permitted by statute to adopt rules from time to time including, we think, those which are applicable to the method and means of effecting service of process. RCW 2.04.190-.200 (Laws of 1925, Ex. Sess., ch. 118, §§ 1, 2); *State ex rel. Foster-Wyman Lumber Co. v. Superior Court,* 148 Wash. 1, 267 P. 770 (1928); *State v. Pavelich,* 153 Wash. 379, 279 P. 1102 (1929). This court has already decided that in a proper case, and in circumstances of true indigency, the court may waive the filing fee. *O'Connor v. Matzdorff,* 76 Wn.2d 589, 458 P.2d 154 (1969). While we find that the appellants here do not have a constitutional right to moneys from the superior court or other funds of the county treasury for the payment of printing and publication costs without a lawful appropriation, a substituted method of service may, in the court's discretion, be authorized by the trial court. The Supreme Court cited *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 94 L. Ed. 865, 70 S. Ct. 652 (1950), in *Boddie v. Connecticut,* 401 U.S. 371, 28 L. Ed. 2d 113, 91 S. Ct. 780 (1971) at 382:

> [S]ervice by publication . . . is the method of notice least calculated to bring to a potential defendant's attention the pendency of judicial proceedings. See *Mullane v. Central Hanover Tr. Co., supra.* We think in this case service at defendant's last known address by mail and posted notice is equally effective as publication in a newspaper.

The legislature already, in cases involving child support,

has paved the way for service by registered or certified mail by allowing the Secretary of the Department of Social and Health Services of the state to serve notice of delinquent child support upon the debtor "at his last known address by certified mail, return receipt requested" (RCW 74.20A.040); and such notice by mail, when refused, may be the basis for an enforceable lien on the debtor's real or personal property or in a garnishment of his wages. RCW 74.20A.060-.090. We recognize, too, that this court has been granted power by the legislature in RCW 2.04.190

> to prescribe, from time to time, the forms of writs and all other process, the mode and manner of framing and filing proceedings and pleadings; *of giving notice and serving writs and process of all kinds;* . . . and generally to regulate and prescribe by rule the forms for and the kind and character of the entire pleading, practice and procedure to be used in all suits, actions, appeals and proceedings of whatever nature by the supreme court, superior courts and justices of the peace of the state.

(Italics ours.)

Applying the common-law methodology of implementing this power to prescribe methods of giving notice and serving writs and process in divorce actions maintained in forma pauperis, we think that the trial court has the discretion to direct that service may be made by registered or certified mail with provision for a return receipt. If the trial court determines, as in *O'Connor v. Matzdorff, supra,* that the divorce complaint is "brought in good faith and [with] probable merit" (76 Wn.2d at 603), and that the plaintiff is truly indigent and not merely financially inconvenienced, and that the action is neither collusive nor frivolous nor so contrived as to enable the defendant spouse to escape the legitimate costs of suit, or the court determines that the defendant spouse cannot be found, then the trial court, upon a proper showing, may order that service of the summons and complaint may be completed by mail by requiring that copies of the documents to be served be deposited in the mails with postage prepaid thereon and ad-

dressed to the last several known addresses of the defendant and with proof of such service and return receipt thereof filed in the case. We do not now pass upon the efficacy of such service beyond provisions for the divorce, the custody of the children of the marriage, and provision for their support, maintenance, custody and visitation.

The writ shall issue in accordance with this opinion in the sound discretion of the superior court to allow the two causes to be filed in forma pauperis at public expense with the method of service of the summons and complaint to be decided by the superior court.

FINLEY, ROSELLINI, HUNTER, STAFFORD, and WRIGHT, JJ., concur.

HAMILTON and UTTER, JJ., concur in the result.

Petition for rehearing granted August 21, 1973.